MOORE, Judge.
Frank Stokes, Jr., appeals from an April 25, 2007, judgment of the Elmore Circuit Court quieting title to certain property owned by the estate of Estelle Haggerty Alexander (hereinafter referred to as “Estelle”). In its judgment, the trial court quieted title to three of six disputed parcels in the Alexander plaintiffs; the Alexander plaintiffs are identified as follows: E’Stella Alexander Webb Cottrell (hereinafter referred to as “Cottrell”);[1] Johnnie Mae Green, the widow of Johnny Alexander, Sr. (“Johnny Sr.”); and the children of Johnny Sr., identified as Lillie Robinson, Oscar C. Alexander, Bertha Mae Humphery, Shirley Alexander, Cathy Alexander, Johnny Alexander, Jr. (“Johnny Jr.”), and Althea Alexander. The trial court also quieted title to the other three parcels (hereinafter referred to as the “farmed parcels”) in the “heirs of Larenda Jenkins,” through whom Frank Stokes, Jr., claimed title. Cottrell cross-appealed from that judgment; the remaining Alexander plaintiffs separately cross-appealed. We affirm in part, reverse in part, and remand.

Factual Background

During her lifetime, Estelle owned six parcels of land located in Elmore County in the vicinity of Rifle Range Road and Dozier Road. In the complaint to quiet title, the parcels were identified as “parcel 1,” consisting of approximately 100 acres for which Estelle had a deed of record in her name; “parcel 2,” consisting of approximately 11 acres; “parcel 3,” consisting of approximately 4.3 acres; “parcel 4,” consisting of approximately 24 acres; “parcel 5,” consisting of approximately 52 acres; and “parcel 6,” consisting of approximately 79 acres. No deed of record was produced for parcels 2 through 6. The parties stipulated that Estelle owned all six parcels at the time of her death.
During her lifetime, Estelle lived on a portion of parcel 1, the 100-acre tract of land. Also during her lifetime, Estelle took in two infants — Cottrell and Johnny Sr. — whom she raised to adulthood. Cott-rell and Johnny Sr. were not related by *126 blood to Estelle or to each other, and Estelle did not legally adopt them. However, at some point before her death, Estelle had a house built for Johnny Sr. and his wife on parcel 1. Cottrell lived in Estelle’s house.
Estelle died in 1962; she left no will. She was buried on parcel 1 alongside her husband. Following Estelle’s death, both Cottrell and Johnny Sr. continued living on the property. Cottrell continued living in Estelle’s house, while Johnny Sr., his wife, Johnnie Mae Green, and their children continued living in the house that Estelle had had built for them on parcel 1.
After Estelle’s death in 1962, the El-more Probate Court appointed Larenda Jenkins, Estelle’s cousin and only living relative by blood, as the administrator of Estelle’s estate.[2] Johnny Sr. and Cottrell each filed claims against Estelle’s estate in amounts of $7,500 and $5,000, respectively, for personal services rendered to Estelle during her lifetime. Johnny Sr. also challenged Jenkins’s appointment as administrator; he filed an action seeking to have himself named as the administrator as the estate’s largest creditor.
A third party also challenged Jenkins’s appointment as administrator, and the matter was removed to the circuit court. After a hearing in 1963, the challenges to Jenkins’s appointment as administrator were dismissed. Although Johnny Sr. voluntarily dismissed his petition, the order resulting from the circuit court’s 1963 hearing also recognized that the challenges filed to Jenkins’s appointment as administrator were “not well taken” and were “denied.” That order also declared that Jenkins was the administrator of Estelle’s estate. No appeal was taken from that order.
Cottrell moved away from the property in approximately 1964 or 1965 and never reestablished a residence thereon. In 1965, Cottrell and Johnny Sr. filed a complaint, alleging that, during her lifetime, Estelle had purchased the six parcels of land for their benefit and that, at the time of Estelle’s death, the property was being held in a constructive trust for them.[3] In that complaint, Johnny Sr. and Cottrell acknowledged that they were not Estelle’s biological or adoptive children.
During the pendency of that 1965 action, Jenkins died intestate; at the time of her death, Jenkins had not closed Estelle’s estate. Johnnie Mae Stokes, Jenkins’s granddaughter, was then named as the administrator of Estelle’s estate. Cottrell and Johnny Sr.’s “constructive trust” action was subsequently dismissed for lack of prosecution.
Johnny Sr. died in 1988; he was buried alongside Estelle. At the time of his death, Johnny Sr.’s wife and several of his children were still living on the property.
Johnnie Mae Stokes, as the administrator of Estelle’s estate, paid the property taxes due on the six parcels; the taxes were assessed in the name of the “estate of Estelle Haggerty Alexander.” Also during Johnnie Mae Stokes’s administration of Estelle’s estate, she leased to third parties the property held in Estelle’s estate. The record contains a copy of a 1991 lease *127 entered into by Johnnie Mae Stokes with E.B. Calloway. That lease provided:
“For the sum of $700.00 for 1991 rent, I, Johnnie Mae Stokes, agree to lease E.B. Calloway all the farming and cotton acreage land of Larenda Jenkins and Estelle Alexander, south of the Rifle Range Road and north of the Rifle Range [Road] joining the Griffin land for the sum of $700.00. We reserve the rights to fish and hunt on said property, my family and the family of Johnny Alexander with hunting and fishing rights going to E.B. Calloway south and north of the Rifle Range [Road]. If this land is sold before the year is out, E.B. Calloway will be given the needed time to gather his crop.”
Another such lease for the year 1993, this one between Johnnie Mae Stokes and Col-vin Davis, was introduced into evidence; the 1993 lease differed from the 1991 lease only in the names of the parties involved and the amount of rent charged for the lease.
Frank Stokes, Jr., Johnnie Mae Stokes’s son, testified that, although other leases could not be located, Johnnie Mae Stokes had leased the property to Calloway and then to Davis repeatedly and continuously during her administration of the estate. Also, according to Oscar Alexander, Johnny Sr. was aware that, during Johnny Sr.’s lifetime, a third party was leasing the property. Oscar believed that the administrator of Estelle’s estate, Johnnie Mae Stokes, was responsible for the leases of the property. Because Johnny Sr. died in 1988, it appears that Johnnie Mae Stokes leased the property even before 1991.
Johnnie Mae Stokes died intestate in 1996 without having formally closed Estelle’s estate. Although Frank Stokes, Jr., was never appointed administrator of Estelle’s estate, he took over the handling of Estelle’s estate. He paid the taxes due on the property and he continued to enter into farming, hunting, and fishing leases pertaining to the property with Colvin Davis until Davis’s death. At that point, Stokes began entering into leases for the use of the property with Colvin’s son, Reese Davis.
In 2002, Cottrell and Oscar Alexander filed a petition, asking the probate court to appoint them as coadministrators of Estelle’s estate. In that petition, Cottrell and Oscar Alexander, one of Johnny Sr.’s sons, claimed that they were the daughter and grandson of Estelle, that the estate was open, and that no administrator existed. Cottrell and Oscar also claimed that, other than the Alexander plaintiffs, they knew of no other heirs to Estelle’s estate. Cottrell and Oscar did not identify the heirs of Larenda Jenkins as Estelle’s kin and heirs at law. Cottrell and Oscar were appointed coadministrators on May 22, 2002.
At some point in 2003, Frank Stokes, Jr., entered into another lease with Reese Davis, granting Davis the right to farm, hunt, and fish on the property in Estelle’s estate. However, because a lawyer representing the Alexander plaintiffs contacted Davis and instructed him not to plant his crop that year, no crops were planted in 2003. Stokes did not enter into any subsequent leases because of this litigation.
In April 2003, the Alexander plaintiffs entered into an agreement to sell the property in Estelle’s estate to a third party. A judgment was entered by the probate court on August 7, 2003, identifying the Alexander plaintiffs as Estelle’s heirs at law and approving the final settlement of Estelle’s estate proposed by the Alexander plaintiffs. There is no indication in the record that any of the pleadings filed in this 2002 probate action were ever served on the heirs of Larenda Jenkins.
*128 On July 24, 2003, the Alexander plaintiffs filed this action in the Elmore Circuit Court (“the trial court”) to quiet title to the land owned by Estelle’s estate. The Alexander plaintiffs alleged that they held color of title to the property because Johnny Sr. and Cottrell were Estelle’s children and that, therefore, they were Estelle’s next of kin; the Alexander plaintiffs also alleged that they had been determined to be Estelle’s heirs at law in conjunction with the 2002 administration of Estelle’s estate. That complaint was subsequently amended to assert title to the property by adverse possession and to acknowledge that none of the Alexander plaintiffs were Estelle’s blood relatives.[4]
Subsequent to the filing of the quiet-title action, Oscar Alexander sold the rights to cut timber on some unspecified portion of the property to a third party. In June 2005, Lillie Robinson entered into a hunting lease with a third party, granting this third party the right to hunt on “150 acres” of the property. All of these pos-sessory acts occurred after the filing of their quiet-title action.
In April 2006, Frank Stokes, Jr., petitioned the probate court to vacate its orders appointing Cottrell and Oscar Alexander as coadministrators of Estelle’s estate and declaring the Alexander plaintiffs to be Estelle’s heirs at law. Stokes also sought a restraining order to prevent the Alexander plaintiffs from selling, transferring, conveying, wasting, or consuming the lands and assets on the lands. On April 26, 2006, the probate court vacated all orders and findings from the 2002 probate proceeding.[5] Shortly before the trial in the quiet-title action, Stokes sought to amend his answer and to assert a counterclaim, asking the court to quiet title to the property in the heirs of Larenda Jenkins; the trial court, however, denied Stokes’s motion to amend.
The Alexander plaintiffs’ quiet-title action was heard at a bench trial conducted in December 2006 and January 2007. The parties stipulated to the specific property at issue and stipulated that the property at issue belonged to Estelle in fee simple at the time of her death. Testifying at the hearing were Oscar Alexander; Fred Gray, the attorney who represented Jenkins in connection with the administration of Estelle’s estate; Johnny Jr.; Cottrell; Clifford Thomas, who knew Estelle; Christopher Cairns, an independent property appraiser who had examined the property at issue; Frank Stokes, Jr.; and Reese Davis, Jr., who had leased the land from Stokes.
It was undisputed that Cottrell and Johnny Sr. had lived on the property beginning before Estelle’s death in 1962. No one disputed that Cottrell and Johnny Sr. lived on the property with the permission of Estelle during her lifetime. Testimony was also presented tending to indicate that, after Estelle’s death, Cottrell and Johnny Sr. remained on the property with the permission of the administrator of Estelle’s estate. However, the Alexander plaintiffs disputed that testimony.
Finally, the trial court received copies of the 1991 and 1993 lease agreements executed by the administrator of Estelle’s estate, in which the administrator leased the entire property to third parties for farming, hunting, and fishing. However, in those leases, the administrator specifically reserved the right of the Alexander plaintiffs to hunt and fish on the land.
*129 Testimony from the Alexander plaintiffs established that they were aware that Jenkins and the Stokeses had repeatedly leased the property to third parties. The Alexander plaintiffs admitted that the crops planted by the lessees were readily visible on the three farmed parcels; one of the Alexander plaintiffs also acknowledged that the leases granted the lessees the right to use all the property. Additionally, one of the lessees, Reese Davis, testified that, while on the property, he had run into Johnny Jr. Davis testified that Johnny Jr. had never questioned Davis’s right to be on the property and had never asked him to leave the property.
Cottrell admitted that she knew Jenkins had been Estelle’s only living relative; she acknowledged that Jenkins and the Stokeses were Estelle’s heirs. The Alexander plaintiffs were also aware that Jenkins and the Stokeses had paid the property taxes since Estelle’s death in 1962 until at least 1997.[6]

Standard of Review

In an action to quiet title, when the trial court hears evidence ore tenus, its judgment will be upheld unless it is palpably wrong or manifestly unjust. Mid-State Homes, Inc. v. King, 287 Ala. 180, 249 So.2d 836 (1971). However, the presumption of correctness does not attach to a trial court’s conclusions of law. Cullman Wholesale, Inc. v. Simmons, 592 So.2d 1031, 1034-35 (Ala.1992); Gaston v. Ames, 514 So.2d 877, 878 (Ala.1987).

Whether the Trial Court Properly Quieted Title to Three of the Six Parcels in the Alexander Plaintiffs Rather Than in the Heirs of Larenda Jenkins

Stokes challenges that aspect of the trial court’s judgment quieting title to three of the parcels in the Alexander plaintiffs; he argues that title to all six parcels should have been quieted in the heirs of Larenda Jenkins.[7] In Woodland Grove Baptist Church v. Woodland Grove Community Cemetery Association, Inc., 947 So.2d 1031 (Ala.2006), our supreme court recognized the following regarding quiet-title actions:
“ ‘The purpose of [an action to quiet title] is not to invest the court with jurisdiction to sell or dispose of the title to land, but merely to determine and settle [title] as between the [plaintiff] and the defendants.’ Dake v. Inglis, 239 Ala. 241, 243, 194 So. 673, 674 (1940) (citing Grayson v. Muckleroy, 220 Ala. 182, 124 So. 217 (1929); and Venable v. Turner, 236 Ala. 483,183 So. 644 (1938)).
*130 This Court has applied a burden-shifting analysis to actions to quiet title under § 6-6-540, Ala.Code 1975:
“ ‘Under a statutory bill to quiet title, where it is shown that [the plaintiff] is in peaceable possession of the land, either actual or constructive, at the time of the filing of the bill and that there was no suit pending to test the validity of the title, a prima facie case is made out, entitling the [plaintiff] to relief, and the burden is then upon [the defendant] to establish his claim to the land. When the [defendant] shows legal title to the land, the burden of avoiding it by showing superior title by adverse possession (or by a better paper title) shifts to the [plaintiff].’ ”
947 So.2d at 1036 (quoting Wiggins v. Stapleton Baptist Church, 282 Ala. 255, 257, 210 So.2d 814, 816-17 (1968)). Thus, in quieting title to any of the parcels in the Alexander plaintiffs, the trial court must have concluded (1) that the Alexander plaintiffs were in peaceable possession of those parcels, and (2) that either the heirs of Larenda Jenkins did not have legal title to the parcels or that Jenkins’s heirs had legal title to the parcels but that the Alexander plaintiffs had superior title through adverse possession. Because of our resolution of this case, we need not address the issue whether the Alexander plaintiffs established peaceable possession.[8] Thus, we address only the second and third elements of the analysis set forth in Woodland Grove Baptist Church, supra.

Whether the Heirs of Larenda Jenkins Established Superior Title to the Property

The evidence indicates that all parties concerned stipulated that the six parcels of property were owned by Estelle in fee simple at the time of her death. The evidence also established that Larenda Jenkins, the great-grandmother of Frank Stokes, Jr., was Estelle’s only living heir at the time of Estelle’s death. Because Estelle died intestate, title to any real property owned by Estelle at the time of her death immediately vested in her heirs at law as tenants in common. See Reese v. Harris, 772 So.2d 1193, 1195 (Ala.Civ.App.2000) (under Alabama law, real property passing through intestate succession passes to the heirs at law as tenants in common and vests immediately in those heirs subject only to recapture for payment of the estate’s debts). Thus, upon Estelle’s death, her property passed into the hands of Jenkins. Upon Jenkins’s death, the property passed into the hands of the heirs of Larenda Jenkins. Moreover, the evidence establishes that those heirs had paid the property taxes on the six parcels from 1962 until at least 1997 and had full authority to lease the property to third parties as they saw fit.[9]
Cottrell argues that Stokes did not refute the possibility that Jenkins or her successors in interest might have deeded some or all the property to a third party and, thus, could not establish that the heirs *131 of Larenda Jenkins continued to hold any title to the property. However, after notice by publication, no one other than Stokes, acting on behalf of Jenkins’s heirs, answered the quiet-title complaint. Additionally, nothing produced at trial indicated that, since Estelle’s death, any of the property had been deeded away.
The purpose of a quiet-title action is to determine as between the parties to that action who has the better title. See Woodland Grove Baptist Church, supra. We therefore conclude that Stokes, as a tenant in common with any other of Jenkins’s heirs at law, presented sufficient evidence to establish that the heirs of Larenda Jenkins held a legal interest in the property.[10]
Under the burden-shifting analysis reiterated in Woodland Grove Baptist Church, supra, once Stokes established that the heirs of Larenda Jenkins held legal title to the property, it was incumbent upon the Alexander plaintiffs to rebut that showing by establishing that they held a superior title to that property either through a superior paper title or through adverse possession.
The Alexander plaintiffs failed to establish that they have any legal title to any of the property at issue. As noted above, the Alexander plaintiffs have no deed of record to any of the property they claim. Additionally, it was undisputed at trial that the Alexander plaintiffs could not have acquired any title to the property through intestate succession. Thus, the Alexander plaintiffs failed to establish that they held any title or even color of title to any of the property. The only other available method by which the Alexander plaintiffs could have established superior title was through adverse possession.

Adverse Possession

“Alabama recognizes two types of adverse possession: (1) statutory adverse possession pursuant to § 6-5-200, Ala. Code 1975, and (2) adverse possession by prescription. Sparks v. Byrd, 562 So.2d 211 (Ala.1990). Specifically,
“‘“Adverse possession by prescription requires actual, exclusive, open, notorious and hostile possession under a claim of right for a period of twenty years. See, Fitts v. Alexander, 277 Ala. 872, 170 So.2d 808 (1965). Statutory adverse possession requires the same elements, but the statute provides further that if the adverse possessor holds under color of title, has paid taxes for ten years, or derives his title by descent cast or devise from a possessor, he may acquire title in ten years, as opposed to the twenty years required for adverse possession by prescription. Code 1975, § 6-5-200. See, Long v. Ladd, 273 Ala. 410, 142 So.2d 660 (1962).” ’ ”
Henderson v. Dunn, 871 So.2d 807, 810 (Ala.Civ.App.2001) (quoting Sparks v. Byrd, 562 So.2d 211, 214 (Ala.1990), quoting in turn Kerlin v. Tensaw Land & Timber Co., 390 So.2d 616, 618 (Ala.1980)). Because the Alexander plaintiffs cannot establish that they held the property under color of title, that they had paid the property taxes for 10 years at the time they filed their quiet-title action, or that they had derived any title to the property by descent or devise, this case involves a claim of adverse possession by prescription. However, because our resolution of this claim turns on permissive use, the *132 analysis herein is equally applicable to a claim of statutory adverse possession.
We conclude that the Alexander plaintiffs cannot establish their claim of adverse possession because, as discussed below, their possession of the property was, at all times, permissive. Possession of property is not presumed to be hostile, and the burden is, at all times, on the party asserting adverse possession to establish by clear and convincing evidence the necessary elements of his or her claim. See Tidwell v. Strickler, 457 So.2d 365, 368 (Ala.1984). For the following reasons, we conclude that the Alexander plaintiffs did not meet this burden of proof.
The parties do not dispute the fact that, during Estelle’s life, Cottrell and Johnny Sr. had lived on the property with Estelle’s permission. Upon Estelle’s death, Cottrell, Johnny Sr., and certain family members of Johnny Sr. remained on the property.
“If the initial use is found to have been permissive, continued use will not ripen into adverse possession by mere lapse of time. Wallace v. Putman, 495 So.2d 1072, 1076 (Ala.1986). ‘In order to change possession from permissive to adverse, the possessor must make a clear and positive disclaimer or repudiation of the true owner’s title.’ Moss v. Woodrow Reynolds & Son Timber Co., 592 So.2d 1029, 1031 (Ala.1992).”
Wadsworth v. Thompson, 912 So.2d 529, 533 (Ala.Civ.App.2005). “ ‘The possessor must give the true owner actual notice of such disavowal, or he must manifest acts or make a declaration of adverseness so notorious that actual notice will be presumed.’” Wadkins v. Melton, 852 So.2d 760, 767 (Ala.Civ.App.2002) (quoting Moss v. Woodrow Reynolds & Son Timber Co., 592 So.2d 1029, 1031 (Ala.1992)). See also Wallace v. Putman, 495 So.2d 1072, 1076 (Ala.1986).
The rule governing permissive entry upon the land of another remains applicable even when the original permissive user is deceased and his or her children or others claiming through him or her continue on the property. See, e.g., Scott v. Bracy, 530 So.2d 799, 801 (Ala.1988) (recognizing that a person possessing property by virtue of an ancestor’s possession has “ ‘no better [rights to possession] ... than that of [his] ancestor’ ” (quoting Parrish v. Davis, 265 Ala. 522, 525, 92 So.2d 897, 900 (1957))). Thus, because Cottrell and Johnny Sr.’s possession of the property was originally permissive, their families’ continued possession of that property could be nothing more than permissive. Such possession could not ripen into adverse possession to the title owner without a “ ‘clear and positive disclaimer or repudiation’ ” of the owner’s title. Wadsworth, 912 So.2d at 533.
We find no evidence of a repudiation or disclaimer of this permissive use preceding the filing of the 2003 quiet-title action by the Alexander plaintiffs. The evidence establishes that the Alexander plaintiffs lived on parcel 1, maintaining only 3 to 4 acres of that 100-acre tract for their personal use. They did not establish any fencing on the property or post any notices on the property to declare in any way that the property belonged to them. They did not notify the administrators or any other heir of Larenda Jenkins that they claimed the property as their own.
Additionally, the Alexander plaintiffs were aware that the taxes assessed against the property were paid by the administrators of Estelle’s estate and then by Frank Stokes, Jr., from 1962 up until at least the late 1990s and possibly until 2003, when this quiet-title action was filed. The Alexander plaintiffs accepted that benefit and continued living on the land without cost *133 until they decided to pursue a quiet-title action.
Further, the Alexander plaintiffs were aware that the administrator was leasing the property to third parties and that those leases applied to all the property in Estelle’s estate. In fact, the two leases included in the record demonstrated the permissive nature of the Alexander plaintiffs’ use. Johnnie Mae Stokes granted third parties the right to farm, hunt, and fish on the property but reserved to the Alexander plaintiffs the right to hunt and fish on the property as well. This permissive use was expressed in a lease agreement as late as 1993. Further, one of the lessees testified that he had run into Johnny Jr. while the lessee was on the property and that Johnny Jr. had not inquired of him why he was there and had not asked him to leave.
Based on the record evidence, it appears that the Alexander plaintiffs knew and acknowledged that the administrators and Frank Stokes, Jr., exercised control over the property and that third parties, acting under the authority of Jenkins and the Stokeses, were within their rights to be on the property. Such acquiescence is inconsistent with the exclusive, hostile, open, and notorious possession of property required to establish adverse possession.
Because the Alexander plaintiffs’ possession of the property was permissive and because they established no evidence of repudiation or disclaimer of that permissive nature, their claim of adverse possession failed as a matter of law.

Whether the Rule of Repose Barred the Trial Court From Quieting Title in the Heirs of Larenda Jenkins

The Alexander plaintiffs argue that the rule of repose barred Stokes from seeking to have title quieted in the heirs of Larenda Jenkins. We disagree.
In Boshell v. Keith, 418 So.2d 89 (Ala.1982), the Alabama Supreme Court discussed extensively the rule of repose. The Court stated:
“[The rule of repose] operates as an absolute bar to claims that are unassert-ed for 20 years. Roach v. Cox, 160 Ala. 425, 49 So. 578 (1909). The rationale for this absolute bar to such actions was set forth in Snodgrass v. Snodgrass, 176 Ala. 276, 58 So. 201 (1912), as follows:
“ ‘As a matter of public policy, and for the repose of society, it has long been the settled policy of this state, as of others, that antiquated demands will not be considered by the courts, and that, without regard to any statute of limitations, there must be a time beyond which human transactions will not be inquired into. It is settled that, after a period of 20 years, without any payment, settlement, or other recognition of liability, mortgages and liens will be presumed to have been paid, settlements will be presumed to have been made by administrators, trustees, agents, and other persons occupying fiduciary positions. It is necessary for the peace and security of society that there should be an end of litigation, and it is inequitable to allow those who have slept upon their rights for a period of 20 years, after they might have demanded an accounting, and after, as is generally the case, the memory of transactions has faded and parties and witnesses passed away, to demand an accounting. The consensus of opinion in the present day is that such presumption is conclusive, and the period of 20 years, without some distinct act in recognition of the trust, a complete bar .... ’ (Emphasis supplied.) Snodgrass, at 176 Ala. 280, 281, 58 So. 201.
“The rule of repose or prescription is a defensive matter similar to, but broad *134 er than, a statute of limitation. Thus, it is unlike adverse possession, which affirmatively establishes title. The rule of repose has been described as ‘... a rule of property in this state, [and] tends to the repose of society, and the quieting of title.’ Spencer v. Hurd, 201 Ala. 269, 270, 77 So. 688, 684 (1918).”
418 So.2d at 91-92 (final emphasis added).
Applying these principles to the instant case, we conclude that the rule of repose did not prevent the trial court from quieting title in the heirs of Larenda Jenkins. When a plaintiff brings a quiet-title action, the defendant is required to defend the state of his or her title to the property and, even in the absence of a cross-claim, is entitled to have title quieted in him or her if he or she can establish superior title to the property. See Myers v. Moorer, 273 Ala. 18, 31, 134 So.2d 168, 181 (1961) (opinion on rehearing); and Chestang v. Tensaw Land & Timber Co., 273 Ala. 8, 18, 134 So.2d 159, 167 (1960). Thus, Stokes’s right to have title quieted in the heirs of Larenda Jenkins arose out of the fact that the Alexander plaintiffs hailed them into court to defend their title. Application of the rule of repose under these circumstances would hinder their defense of the Alexander plaintiffs’ action.
This conclusion is also supported by Oehmig v. Johnson, 638 So.2d 846 (Ala.1994), overruled on other grounds, Ex parte Liberty National Life Insurance Co., 825 So.2d 758 (Ala.2002). In Oehmig, the supreme court stated:
“The rule of repose is ‘a defensive matter’ and ‘is unlike adverse possession, which affirmatively establishes title.’ Boshell v. Keith, 418 So.2d 89, 92 (Ala. 1982). The rule of repose has been described as the ‘running of the period against claims ’ rather than a device to displace title. Id. (Emphasis in original.) We hold that the rule of repose cannot be used against one with valid record title by one who clearly does not have title.”
638 So.2d at 850. Thus, the rule of repose does not allow a plaintiff without title to obtain property from a defendant with title. Application of the rule of repose favors the status quo, not a change in title.
Finally, as recognized in Ex parte Liberty National Life Insurance Co., supra, ‘“[t]he only circumstance that will stay the running of the 20-year period of repose is a recognition of the existence of the claimant’s right by the party defending against the claim.’ ” 825 So.2d at 765 (quoting Boshell, 418 So.2d at 92). Thus, even if we applied the rule of repose to this quiet-title action, the running of the rule of repose was properly stayed by the Alexander plaintiffs’ recognition of the rights belonging to the heirs of Larenda Jenkins. For these reasons, the rule of repose did not bar the quieting of title in favor the heirs of Larenda Jenkins.

Conclusion

We reverse that portion of the trial court’s judgment quieting title to three parcels in the Alexander plaintiffs, and we instruct the trial court to enter a judgment quieting title to those three parcels in the heirs of Larenda Jenkins. We also affirm that portion of the trial court’s judgment quieting title in the heirs of Larenda Jenkins to the three farmed parcels. We remand this cause to the trial court for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.

. The parties spell Cottrell's first name in different ways: Estelle and E’Stella. That name is also represented in different ways in the record. In this opinion, we adopt the spelling used by Cottrell in her appellee's brief/cross-appellant's brief.

. Under the probate law in effect at the time of Estelle’s death, Title 61, § 81, Ala.Code 1940 (Recomp. 195 8), the next of kin entitled to share in the decedent’s estate was given priority for the position of administrator if no spouse survived the decedent. If no next of kin entitled to share in the estate could be identified, the largest creditor was to be named as administrator of the decedent’s estate.

. Cottrell was a minor at the time this complaint was filed, and, thus, it was filed by and through her father, as her best friend.

. After a family dispute arose between Cott-rell and the remaining Alexander plaintiffs, Cottrell retained separate counsel.

. At this point in the litigation, Cottrell obtained separate counsel to represent her in the action to quiet title.

. An exhibit presented to the trial court indicated that, in 1997, Cottrell made a partial payment toward the taxes; in 1998 and 1999, Frank Stokes, Jr., and Cottrell each paid an amount toward the taxes; in 2000 and 2001, Stokes paid the taxes; and, from 2002 until 2005, Oscar Alexander and Lillie Robinson paid the taxes. However, the testimony regarding the payment of taxes from 1997 through 2005 was disputed and did not entirely support this exhibit.

. The trial court was authorized, in conjunction with this quiet-title action, to consider whether Stokes, acting on behalf of the heirs of Larenda Jenkins, was entitled to have title quieted in him. See Myers v. Moorer, 273 Ala. 18, 134 So.2d 168 (1961) (recognizing that when a defendant in a quiet-title action established his superior title to the property, a trial court was authorized to grant the defendant appropriate relief even in the absence of a cross-claim by the defendant); and Chestang v. Tensaw Land & Timber Co., 273 Ala. 8, 134 So.2d 159 (1960) (recognizing that in quiet-title actions, even when complainant cannot show peaceable possession, the trial court does not lose jurisdiction to address respondent’s title to the property; if the respondent shows that he has better title and peaceable possession, title should be quieted in him). Thus, we need not consider jurisdictional issues such as those addressed in Price v. Robinson, 242 Ala. 626, 7 So.2d 568 (1942); and Buchmann Abstract & Inv. Co. v. Roberts, 213 Ala. 520, 105 So. 675 (1925).

. Even if the Alexander plaintiffs were in peaceable possession of some or all the property, we conclude that they could not meet the odier necessary element of their quiet-title action. Thus, we pretermit discussion of the peaceable-possession element.

. We also reject the Alexander plaintiffs’ assertion that the amount of rent charged by the Stokeses for the three parcels never exceeded the amount of taxes due on the property and that the use of those rents to pay the taxes was merely for the benefit of the Alexander plaintiffs. The record reveals that Johnnie Mae Stokes leased the property to Colvin Davis in 1993 for the amount of $900. The tax records contained in the clerk's record establish that the total amount of taxes due on the property never reached that amount.

. Legal title has been defined as "[a] title that evidences apparent ownership but does not necessarily signify full and complete title or a beneficial interest.” Black’s Law Dictionary 1523 (8th ed.2004).